All right, our next case for this morning, I might as well announce it, is United States against Pace, number 212151, and we'll let the courtroom get organized, and then we'll hear shortly from Mr. Drysdale. Yes, you may proceed. Thank you, Your Honor. May it please the Court, my name is Tom Drysdale, and I'm here today on behalf of the defendant, Roger Pace. Now, there are two very distinct issues before the Court today. The first one is whether or not the police officer's use of emergency lights in this case constituted a seizure of Mr. Pace, and if so, whether or not there was reasonable suspicion at the point of seizure. The second is a completely separate issue, and that concerns Mr. Pace's eligibility for safety valve relief under the plain language of 18 U.S.C. 3553F. So I'd like to start with the suppression issue here, and in particular the issue of when Mr. Pace was seized. As this Court is well aware, the hallmark of seizure is whether or not a reasonable person in Mr. Pace's circumstances would feel free to walk away from the officer and ignore him. And the District Court correctly found here that the point of seizure was when Officer Crowder activated his emergency lights, based on the facts of this case. And I want to be clear, we're not saying that police officers activating their emergency lights is always a seizure. That is not our position. But here it was. When the officer approached Mr. Pace, he did not have his emergency lights on. So this interaction did not start with emergency lights. Then they had a conversation. Mr. Pace told Officer Crowder he was lost and looking for directions. Officer Crowder confirmed that Mr. Pace was on the right track, that the street he was looking for was down that street. Is there any additional fact about that moment, the fact that Mr. Pace mentions Jennifer Johns? I think, Your Honor, that that is actually the only thing that the officer could have possibly based reasonable suspicion on. So that's separate as to whether or not he was seized at the moment, because the government contends that the lights were not a seizure. But I think Your Honor is correct that the only thing this officer is basing any suspicion on whatsoever is this person, Jennifer Johns, who Mr. Pace was going to meet. And it's kind of late in the evening. It's not like super late, but it depends how old you are, I guess. But, you know, 1030 at night, 1030, 1035, you know, isn't good into the evening if you're sitting there lost in a parking lot. Wasn't the business closed as well? He was. So if you watch the video, Your Honor, he's underneath a street light and he's kind of at the edge of the parking lot of the business and the edge of the parking lot of the street. And really what happened there is Mr. Pace needed to pull over to use his cell phone to call directions because he can't do that while he's driving. So he found a safe place to pull over underneath a street lamp at the edge of this street in this business. And so that's when the officer approaches him and says, hey, what's going on here? They have this interaction. Why is it not enough to find reasonable suspicion when the officer says, what are you looking for? He says a known drug house. Well, first of all, Your Honor, why is that not reasonable suspicion for the officer to ask a few more questions? First of all, Your Honor, I would disagree that it's a known drug house. The record doesn't support that fact. The record actually indicates that Officer Crowder had some information that there were individuals coming and going from the house. That's what he testified to at the suppression hearing. He, in fact, did not testify to knowing it was a drug house. But didn't he testify that Jennifer Johns and maybe her mother, too, but at least Jennifer, had been associated with methamphetamine? And again, Your Honor, this is where I think both the government and the district court have mischaracterized the record. Because what he testified to is that Johns and her mother may, he had a tip that they may be involved in methamphetamine. And he may have saw her high on methamphetamine at one point because she exhibited some symptoms that might be consistent with methamphetamine intoxication. And that's the point. It's a hunch on a hunch on a hunch. And that is not reasonable suspicion. It's less than probable cause, but it is more than a hunch. And finding reasonable suspicion, in this case, on these facts, essentially subjects anyone who's going to visit someone who, unbeknownst to them, may or may not be a drug dealer, now all of a sudden they're a methamphetamine person. That's simply inconsistent with the Fourth Amendment. What Officer Crowder maybe had here was some suspicion about Jennifer Johns, not Roger Pace. Roger Pace isn't doing anything suspicious. He's just traveling from out of town to visit a friend. That's all he's doing. And even if all of this information about Jennifer Johns turns out to be true, that she's involved with methamphetamine, that her mom's involved with methamphetamine, it still doesn't make Roger Pace reasonably suspicious in these circumstances just because he's going to visit her. That doesn't make him reasonably suspicious. And the government hasn't given this court one case where reasonable suspicion was found on facts this thin. There's nothing in their brief that cites a case where reasonable suspicion was this thin. We cite the Jerez case where there was arguably more suspicion, and this court still found that reasonable suspicion lacked in that case. And it's basically the same facts. There's a two-door, what they identified as a, quote, target vehicle with a Florida license plate from a source state parked near the airport. And the officers run the criminal history of the defendant, and they find out that he has no valid driver's license. So they go into his hotel room and they seize him. And this court said that is not reasonable suspicion. And that's based on the defendant's own criminal history, not the alleged criminal activities of a third party that aren't even verified. So you need us not to get past the activation of the overhead lights, because then a little while after that, that's when he takes the driver's license, right, and runs the license, finds out about Mr. Pace's own record. Your driver's license, I would still argue there's no reasonable suspicion, because the facts don't change other than this amorphous concept of Mr. Pace being, quote, too friendly. And I don't really know what that means. I don't know why it's a good idea to be hostile towards police officers. Well, I know, but isn't it completely weird that he says he'll take this instrument out of the back of the car and play a few tunes? It's unquestionably weird. I cannot deny that it's unquestionably weird. But I think the point we need to remember here is I'm not sure where overly friendly begins and where it ends, because the instrument comment comes after the driver's license is taken. He's already unquestionably seized after the instrument comment. And every other fact that the government tries to rely on here, they all come after the seizure. The kicker here, Your Honor, is Mr. Pace's methamphetamine probation. That's the reasonable suspicion. Linked with what he knows, or at least what he recalls about John. That's correct, Your Honor. The officer needs that extra piece of information before Jennifer John's and John's information becomes suspicious. And it's unquestionable that he didn't have it until after the seizure. And you cannot use post-seizure conduct to justify your seizure. So we think it's incredibly clear here that the district court committed an error in finding that reasonable suspicion existed at the point of seizure, which was when the police lights were activated. So I'd like to turn to the other point. Yeah, I would like to hear what you have to say about this safety valve argument. It's interesting that there's a conflict in the circuits. There is, Your Honor. As you've correctly identified, there is a conflict between the Ninth and the Eleventh Circuit. The Ninth Circuit has adopted the reading, we advance. The Eleventh Circuit has sided with the government only on the issue of the cannon against surplusage. They did not address any of the other issues that were raised in the Ninth Circuit and that we raise in front of this court. What I would like to point out in relation to the way this case was argued in the Ninth Circuit, particularly by the government, is five concessions that the government made. They conceded that their interpretation and means or in 3553 F1, that's the government's position. It defies the plain and common meaning of the word and. It ignores the structure of 3553 F1 as conjunctive negative proof. It disregards Congress's legislative drafting manual. It goes against the canon of consistent usage and it destroys the entire structure of the safety valve. These were concessions made by the DOJ in the Ninth Circuit. And I guess what I understood you to be arguing basically is, you know, what's sauce for the plain language fans on many courts in this country, including our superiors at the Supreme Court. And if Congress wanted to fix this, it wouldn't be the first time I've seen a statute that accidentally used the wrong word. It could change and to or. But their argument is when would you ever have B and C and not automatically have A. That's the surplusage. So that is their surplusage position. That's the position that ultimately, I think, carried the day in the Eleventh Circuit, but it was rejected in the Ninth. And the way that goes is it's a guideline range argument. It's 4A1.1 basically separates out A and B. And the government says, well, you can never have a two-point violent offense and a three-point violent offense. They can't be the same thing ever. But first of all, the Ninth Circuit rejected it and we think they're right by arguing that 4A1.1 was created to add criminal history points. So it makes sense that it's only counted once there. That wasn't statutory interpretation. That's guidelines adding criminal history points. Mr. Dreisand, why don't you just carry the does not through the statute? I just don't see that. That's the MDASH argument, Your Honor. It was lifted, essentially, by a district court in Idaho from an interpretation of the FMLA. So they're bringing it from civil law in and there's a lot of problems with the MDASH argument. First of all, the MDASH argument is not consistent through 3553F. When you look at 3553F4, Congress uses the structure that the government wishes they would have used in F1. It says, was not and was not. That's precisely what the government wants F1 to read, but it doesn't read that. So there's no reason to read F1 different than F4. They're drafted that way. Congress did that on purpose because Congress meant something different. And the other problem, as the Ninth Circuit correctly recognized, is the government's MDASH theory destroys the entire structure of the safety valve because you have to apply it consistently throughout the statute. And then the modifier that opens up 3553F, that opening paragraph that essentially says the district court shall disregard the mandatory minimum if it finds, if you distribute that language through each of the subsections and the government admitted this in the Ninth Circuit, everybody becomes safety valve eligible if they, even if one of those provisions are true. So for example, if your offense did not result in death or bodily injury, you are now safety valve eligible. That's not what Congress meant. They meant on each of those. And the Ninth Circuit found it, the government conceded it, the MDASH theory destroys 3553F. And you're also saying that there's no argument for a selective MDASH theory where it's just subpart one. Not only that, Your Honor, but we would go as far as to say that if we start using the MDASH like this, then we're going to be up here and in the district courts litigating every single MDASH that exists in Title 18 of the code and beyond, actually. So it's just simply not the way the statute is written. And as Your Honor pointed out, if Congress wants to change this, they can. That's their job. And they haven't. If there's no questions at the moment, I'd like to reserve my remaining time. Thank you. Thank you. Mr. Keenstrom. May it please the Court. Good morning, Your Honors. My name is Jeff Keenstrom, and I represent the United States. Beginning with the suppression issue, the keys here are that reasonable suspicion developed early on in the encounter, and the encounter didn't become a stop until late once the officer placed the defendant in handcuffs. And so either of those... That seems awfully late for it turning into at least a detention that's a Terry-type detention. I mean, it seems to me... I mean, the government mostly lives in the world of fiction anyway, about where people are going to feel free to leave. People don't feel free to leave, and I'm sure that by the time Officer Crowder pulls his cruiser up behind the car and activates the light, it would be a very surprising thought to me that Mr. Pace felt free to leave. I mean, if common sense has anything to do with law, which I hope it does. So if we look at the light, and I think there are many circumstances in which the lights can signal a stop. For example, you're driving down the street, an officer pulls behind you, he's driving behind you with his lights on. Everyone knows you have to pull over at that point. And you've been stopped. You're not free to leave. You're not supposed to gun the accelerator at that point. Certainly. But there are many instances when officers use their lights for reasons other than indicating a stop. And that's exactly what happened here is one illustration of that. But how does the person objectively... You can't ask the stopped person to discern what's inside the brain of the officer when the officer activates the lights. It's got to be on objectively observable data. Right. So that's a fair point. And that's where we look at all the other factors in what just happened, and the Holley factors, so to speak. The lights are one of those, but every other one points towards no stop occurring. And that's, this occurred in public. There's only one officer present. They had just had a conversation. And during that conversation, it was cordial. They spoke in a conversational manner, asking for directions. The officer didn't brandish a weapon, didn't give any indication at that point that he wasn't speaking in a forceful tone indicating that he was requiring the defendant to comply. And then at that point, after this cordial conversation, the officer then backs up away from the defendant's car, turns on his lights, and backs up even a little further then. And so when we look at all the facts together, the lights, which can signal a stop, but in any other circumstances, they don't signal a stop. I think it's very common that when officers arrive at a scene and get out of their car, they turn on their lights to identify themselves as officers and to signal their presence at the scene. So there's one factor that's somewhat ambiguous. It can point either way depending on the circumstances. But every other factor points in favor of no stop occurring. And I think obviously it is objective, but if you look at the video, the defendant is rather unconcerned with the car. He's already parked, standing outside of his car. So that kind of brings us outside of the idiom of where an officer is pulling behind a car that's moving. So the defendant is already outside of his car. He's talking on his cell phone. So really, it's not as so much as whether the defendant has to stop or whether he's free to leave, because he already is stopped. And he's already outside of his car. So that really brings us into the Bostic framework, where the question is, does he feel free to leave? And he really is ignoring the officer at that point. He's talking on his cell phone. And then the officer comes up to speak with him. So I think a reasonable person in that circumstance would not have felt that they were compelled to speak with the officer just because he had turned his lights on. And how is he free to leave once his driver's license has been taken? So I would differ with the characterization of taken. The court found that the officer asked for the driver's license, and the defendant then provided it. Do you think the defendant was likely to say, no, I'm not going to give it to you? He certainly had that opportunity. The officer didn't even tell him. He didn't tell him. He just said, do you have your license with you? And then the defendant reached into his car and provided it to him. And it's very clear, the law is quite clear that asking for a defendant or a person to voluntarily provide their driver's license is not a seizure. And so when the defendant complied then, it didn't turn that voluntary request into a seizure. So once the defendant provided his license while they were at the car, at that point then the officer noticed the unusual degree of nervousness, as well as what... Is there a case that the government has ever brought where they didn't talk about somebody's nervousness? I'm sure... Not in my experience. People don't like talking to police officers. Oh, that's true. And it's not just nervousness here. The officer said that this is an unusual degree of nervousness for his interactions with the public. So it's not within the heartland of jitters speaking with officers. The officer specifically said this was unusual in his experience to be that nervous. And of course, when we combine it with the bizarre behavior, very unusual behavior, getting a guitar out in the middle of the night, at least late in the evening... No, and I think that's what... Well, it makes it bizarre that the defendant is just taking out his guitar to play it to an officer in a parking lot late at night in this town. And on its own, that might just be unusual, but in combination with all the other facts that I think very clearly pushes this beyond the line of reasonable suspicion. I don't think it cuts one way or the other on reasonable suspicion. It's just odd. I don't see any vector on it, really. I think it at least piques the officer's interest and would signal that something's off here. Something that warrants further investigation and inquiry. And of course, with totality of circumstances, that means not only that we're looking at everything the officer knows, but also that we're looking at them collectively. And so the nervousness, the fact that he's parked in a parking lot of a closed shop late at night in a small town where the officer said there's very little activity going on. And then he says he's going to meet two particular people at a particular place. And the officer knew quite a bit more than the defendant characterizes it. In the last year, the officer had seen Jennifer Johns and he observed her to be high on methamphetamine. They interacted. He assumed she was high on methamphetamine. She's very fidgety. She's taking her shoes on and off. She's doing things. So he makes the assumption that's meth. He doesn't see or take meth or anything. He didn't see or take meth. He didn't give her a drug test, but he's an officer in a town that has a meth problem. And he personally interacted with this person and identified the specific reasons why he reached the conclusion that she that she was high on meth at that time. Only two months earlier, she had given him actually gotten any training in identifying meth symptoms. The record doesn't reflect that, Your Honor. Only two months earlier, she had given him actual information on meth use in town. And that, in fact, led to an arrest. There's, of course, the tip. And the tip, the quote was, quote, Johns and her mother were using moving meth. That's at page 74 of the transcript. So the defendant characterizes that very loosely. But that was the specific quote, that Johns and her mother were using moving meth. And the neighbor complains, right? Exactly. The neighbor complains, which ties that particular activity to the particular place that the defendant's going. Had Johns also informed Crowder, the police officer, about meth dealing? Yes. So I think it was specifically meth use in town. But yeah, that was the second factor that the officer knew. Use as opposed to dealing. I believe so. Meth use in town. And of course, then we have the neighbor complaints. So this, a man comes out of the house, but nobody gets out. Someone comes from the house to the car, and the car drives away, all within 30 seconds to a minute. In combination with all the other facts, that suggests that essentially this is a drug marketplace, or at least that allows the officer to reasonably conclude that. When Pace comes at 1030 at night in a small town where there's very little other activity, and is meeting these same two people at the same place where that's occurring, that added up to a reasonable suspicion when evaluating the totality of the circumstances. And then it becomes much easier once we look past the time of the lights when we add in the unusual nervousness and the other factors. So we think that the district court correctly denied the motion to suppress. So I wonder if you could turn to this safety valve. I feel like one is back in English grammar class. But it's very hard to read this statute without finding the kind of ambiguity that at least the rule of lenity would suggest favors the defendant. You have a problem no matter what you do with it. So if we look purely at the grammar, the government has a permissible reading at the very least. And we think that we have the better reading as a grammatical matter. But it's not a consistent reading. You have to cherry pick, you know, this is what the em dash means here, this is what the em dash means there, this is what and means here, this is what and means there. And there's no organizing principle behind that. And so all this is anyway is a sentencing statute that allows the district courts the discretion, not even the compulsion, to go below a mandatory minimum when these various things are satisfied. So why doesn't it make sense to see A, B, and C as kind of cumulative? You have to have all three of those things. You can't have a lot of criminal history, you can't have any significant offense, three-point offense, and you can't have anything that's violent. And if all three of those conditions are there, then they all three have to be met. So there's a lot there. I'd like to begin with the consistency. So the government does give a consistent reading. To satisfy F1, the defendant must show that he satisfies each of the subparagraphs of that provision. So he must show that he does not have A. But what about the previous em dash that your opponent was arguing about? So you get the meet even just one of the F1 through five criteria? No, so it's just the same. He has to meet all five of the criteria of F to be safety valve eligible, just as he has to meet all three of the criteria of F1 to meet that particular element. He must show that he does not have A, B, and C. Just as to be eligible for the safety valve, he has to show that he has one, two, three, four, and five. I think the other two main points are the surplusage, and absurdity. That only the government's argument avoids rendering two of the three subparts pointless or absurd. I don't think so. It's certainly the Ninth Circuit didn't think that. They found a rational reading. So the Ninth Circuit... Is the Ninth Circuit absurd? No, but it made a legal error in believing that C could be satisfied with a two or three points violent offense. So it rewrote C in that respect. The defendant and the Ninth Circuit... I think he admits that the guidelines themselves define two and three point offenses as mutually exclusive. And the argument then is that the guidelines serve one purpose, the safety valve serves another, so we should read them differently. But the problem is that C specifically adopts the guideline definition. It says it must be a two point violent offense as determined under the sentencing guidelines. And because the sentencing guidelines define them as mutually exclusive, then C requires it to be a two point violent offense, not a three point violent offense. And so when we get that far, then we know that there is a surplusage problem. Because if you have a three point offense under B, and a two point offense under C, you necessarily have more than four criminal history points to satisfy A. At the same point, if we get that far, the defendant concedes the absurdity of his reply brief. It's also in Lopez footnote 10, where he concedes that it would be absurd for a person to satisfy the safety valve if... I'm trying to get this right. For a person to be excluded under the safety valve if they have a three point offense, plus a violent offense for which they received a 90 day sentence, but for that person to become eligible and to satisfy A if instead of a 90 day sentence, they had received a much more serious 15 year sentence on the violent offense. And they're not eligible anyway. I mean, this isn't the only part of the safety valve statute. So it's only the government's interpretation that that same person would be ineligible because they would, under the government's interpretation, anyone with a three point offense for any reason is independently precluded because they can't satisfy F1B. And of course, as the defendant also notes correctly, that there are other elements of the safety valve, but our inquiry here is what does F1 mean? And so the government's absurdity argument isn't that it's just going to make the safety valve too broad. I think we've been forthright that Congress could have, but didn't require both a three point offense and a violent offense. Because what it specifically said is a three point offense and a two point violent offense. And by requiring that to be two points, that creates both the surplus issue and the absurdity. So I'm going to go over to your hamburger example. There are two things I don't like about that. First of all, it depends on the use of bad grammar. If a person says, please make sure my burger does not have ketchup, mustard, and pickles. Because if the person doesn't want either ketchup or mustard or pickles, they would say or pickles. The second problem is maybe they don't like the way those three flavors mix. And so they'd be perfectly happy to have ketchup and mustard with no pickles, or they'd be glad to have mustard and pickles with no ketchup. So I don't think you're necessarily right that you can use that example. They don't want those three things in combination, is the natural way to read ketchup, mustard, and pickles. So two things about that in reverse order. The first is that that is a permissible interpretation. It could be referring to either. And that's exactly the point. No, it can't be. I mean, unless we assume bad grammar, it isn't possible to read it the other way. So I respectfully differ in that respect. And the government cited a drafting manual by Kenneth Adams. And he says that when and is used to join multiple direct objects in a sentence framed as a prohibition, the most natural meaning is in fact that each direct object is individually prohibited, not cumulatively. So the examples he gives are. I'm not sure I agree with him on that respect. Well, I guess to give a better example than the problem is that. How can you say I don't want this combination? I happen to hate pickles. And so I might say I don't want a burger with ketchup, mustard, and pickles. And so the conjunction alone cannot definitively resolve it in either party's favor. For example, here I think the defendant could make much of the same argument even if it said the word or. And the argument in that respect would go, he has shown he does not have C. And he would say that or then is disjunctive. And so I do not also have to prove that I don't have A and B. He would argue that he's satisfied by showing that he does not have C. And so really the. It's all about what Congress wanted though. I mean, our job is not to rewrite Congress's statutes to make them be what we wish they were. I can think of a lot that I might rewrite on that. That's certainly correct. And we agree with the court in that respect. As Judge Kirsch addressed with the opposing counsel, it's natural and acceptable to read does not have as being distributed to and modifying each subparagraph of F1, in which case the government offers a perfectly natural meaning or natural interpretation. One example in the drafting manual is. It depends where the parentheses are. It's like a math problem. Does not have parentheses A plus B plus C or does not have A, does not have B, does not have C. They aren't necessarily the same. Right. And if this was written in German, it would be very easy to see that. Unfortunately, the English language just doesn't work with that precision when it's expressed verbally rather than in that with that precision. And so we do have a case here where both parties offer permissible interpretations of the text. And then so we look to the contextual factors and the surplus. Why doesn't the rule of lenity come in at that point? Why don't you take the one if there really is this fatal ambiguity, the rule of lenity says the tie goes to the defendant. Because it's only ambiguous if you confine your inquiries purely to the grammar. Once you look at the text and consult the other interpretive tools. But the point of this statute was to give people a break. And indeed, it expanded the break that they got as the First Step Act made it a more liberal break. That's correct. So you're kind of taking away with one hand what Congress gave with the other. Not quite, because even though the government's interpretation, it's quite a significant expansion. Under the government's interpretation, for example, you could be a career offender and still qualify if you have one point predicate offenses. You could fall in criminal history category four if you have two two-point convictions and four one-point convictions. Whereas it used to be that you had to be, if you're beyond category one, you'd be disqualified. It was just one point, yeah. Exactly. So even under the government's interpretation, there's a lot of daylight between the two. There's many people that wouldn't have qualified then but do qualify now. So the government does give meaning to the intent that it be an expansion of the safety balance. Okay, well, we're going to have to stop it there and I will give Mr. Drysdale a little bit of extra time to balance things out. Thank you, Your Honors. You can give him, that's two and a half, you can give him four. There might be a lot of instances where police lights aren't a seizure. This isn't one of them. These two individuals had a conversation about being lost. Any reasonable person in Roger Pace's situation would have expected that police officer to get in his car and leave. Instead, he backed his car up, bumper to bumper with the defendant and turned on his lights. He showed his authority. No reasonable person would think that they could just get in their vehicle and drive away. That argument defies common sense and it defies the way the individuals in the public deal with the police and it creates a dangerous situation. He needed to identify himself as an officer is what the government says. No, he didn't. They just had a conversation. Why would he need to identify himself as an officer? He had no other reason except to seize Mr. Pace. Whether or not it's bizarre that Mr. Pace offered to play some instruments does not matter. It's after the seizure. And I also want to clear up with a direct quote from the transcript what officer Crowder knew about Jennifer Johns. Page 15 of the suppression hearing transcript says, question and Ms. Lemons provided information to you about Jennifer Johns and her mother potentially being involved in methamphetamine activity. Answer, correct. There was no statement by that officer that he knew that her mother and Ms. Johns were involved in methamphetamine activity. There is no reasonable suspicion when you come in town to visit an individual, even if it's at night, even if you're from out of town, and even if that individual might be involved with drug activity that turns the fourth amendment on its head and allows officers to seize everyone based on a hunch and apparently based on on what they know about some individual from their childhood and guessing about methamphetamine intoxication. This is not reasonable suspicion. Now, I want to turn to a couple of the points the government made about the safety valve. First of all, when we talk about the absurdity canon, the government seems to miss the point of what the absurdity canon actually does. The quote from the Supreme Court is that it has to create results where it is quite impossible that Congress could have public citizen in his concurrence. It is certainly, as Your Honor pointed out, not quite impossible that Congress intended to place more emphasis on the instant offense through F2, 3, 4, and 5, rather than the criminal history on F1. That's the point of the First Step Act, is to cut people a break, as Judge Wood pointed out. And the other thing seems to be the surplusage argument, which really seems to be where the government wants to hang their hat. We don't think this creates surplusage. We agree with the Ninth Circuit, but as the concurring judge in the Ninth Circuit found, even if it does, it does not overcome the multitude of statutory interpretation tools that favors our reading. And means and. Congress wrote and. They wanted it to mean and. If they don't like it, Congress should fix it. And if at the end of the day... And you have to put the parentheses, A plus B plus C. It can't be not A and not B and not C, because there are lots of ands in that phrase. And that's absolutely right. And every and in that statute is conjunctive. It has to be, or the statute doesn't work. And every or is disjunctive. But Mr. Drysdale, for your reading, the statute has to be about eligibility. It's not. It's about ineligibility. You want it to be about eligibility. You want to get the word not out of there. So you want it to say, does. A, B, C. You see what I mean? The statute is written about, it's a negative, to be ineligible. That's a negative statute, to be ineligible. Right? But you wanted to say, to be eligible. Then your reading makes sense, but that's not what it says. Well, I want it to read in conjunctive negative proof, like it's drafted and like Garner and Scalia have recognized, it is drafted a negative followed by a conjunctive. And they give the example in, and we've briefed it pretty heavily on conjunctive negative proof. But when it says, don't follow by the word and, it's in combination. Don't drink and drive. You can drink, you can drive, you can't drink and drive. That's how this statute is drafted. That's what the Ninth Circuit found. The government conceded it in the Ninth Circuit, and it's I'm out of time, but I just briefly, at the end of the day, if this court does think the government's reading is plausible, this is a statute about mandatory minimum prison terms. The rule of lenity has got to take over, and the defendant's reading has got to trump the government's reading until Congress fixes it, even if it's ambiguous. Thank you, Your Honors. All right. Thank you very much. Thanks to both counsel. Interesting arguments. The court will take the case under advisement.